THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

INNOVATIVE SOLUTIONS
INTERNATIONAL, INC.,

                    Plaintiff,

      v.

HOULIHAN TRADING CO., INC, *et al.*,

                    Defendants.

CASE NO. C22-0296-JCC

ORDER

This matter comes before the Court on Defendant Pilgrim's Pride Corporation's ("Pilgrim's") renewed motion for judgment as a matter of law or, in the alternative, for a new trial or a remittitur (Dkt. No. 400). Having thoroughly considered the briefing and the relevant record, the Court hereby GRANTS in part and DENIES in part the motion for the reasons explained herein.

## I.    BACKGROUND

The above-captioned matter arose out of a supply chain dispute regarding Pilgrim's raw chicken with product code 584 (hereinafter "the Product"). (Dkt. No. 311 at 16–17.) In the summer of 2021, Plaintiff Innovative Solutions International, Inc. ("Innovative") purchased truckloads of the Product through a broker, Defendant Houlihan Trading Co., Inc. ("Houlihan"), to create its Chile Lime Chicken Burgers (hereinafter the "Burger"), which Innovative sold exclusively to Trader Joe's. (*Id*. at 16.) That fall, Trader Joe's received an unusual volume of customer complaints about bone fragments in the Burgers, which led Innovative to recall the

Burgers and Trader Joe's to terminate its business relationship with Innovative. (Dkt. Nos. 247 at 2, 311 at 18.) The Court has stated the other relevant facts and procedural history of this case in prior orders, (*see generally* Dkt. Nos. 247, 311, 377, 388), and will not restate them here.

On December 2, 2024, the parties commenced a jury trial, wherein Innovative and Houlihan presented their respective claims and crossclaims against Pilgrim's. (Dkt. No. 316.) At the close of their cases in chief, Pilgrim's moved for judgment as a matter of law, which the Court denied. (Dkt. No. 329.) Following six days of trial, (*see* Dkt. Nos. 316, 322, 323, 325, 329, 334), the jury rendered verdicts in Innovative's and Houlihan's favor. (*See generally* Dkt. No. 339.) The jury found that Innovative prevailed against Pilgrim's on its claims of negligence, negligent misrepresentation, and violation of the Washington Consumer Protection Act ("CPA"), RCW 19.86.010, *et seq*. (*See id*. at 2, 3, 4.) The jury awarded Innovative $10,500,000 for all three claims. (*Id*.) It further found Pilgrim's solely liable for Innovative's tort-based claims. (*See id.* at 3, 4.) Similarly, the jury found that Houlihan prevailed on its breach of express warranty crossclaim against Pilgrim's. (*Id*. at 5.) It awarded Houlihan $1,500,000. (*Id*.)

Thereafter, the parties engaged in post-trial motions practice. Innovative moved for attorney fees and costs, treble damages, and post-judgment interest (Dkt. No. 355), which the Court largely granted (Dkt. No. 377). Similarly, Houlihan moved for indemnity, equitable subrogation, attorney fees and costs, and post-judgment interest (Dkt. No. 372), which the Court again largely granted (Dkt. No. 388). Finally, the Court entered an amended supplemental judgment in accordance with its post-trial rulings and the jury's verdict (Dkt. No. 392). Pilgrim's now challenges the jury's verdict and the Court's final judgment. (*See generally* Dkt. No. 400.)

## II.    DISCUSSION

### A.    Renewed Motion for Judgment as a Matter of Law

Pilgrim's argues that the evidence at trial does not support the jury's verdict on *any* of Innovative's and Houlihan's claims. (*See generally* Dkt. No. 400.) In opposing, Innovative and

1 Houlihan point to evidence supporting the jury's verdict as to each claim. (*See* Dkt. Nos. 403 at
2 3–5, 405 at 12–21.)

3                    1.    Legal Standard

4         A party whose motion for judgment as a matter of law was previously denied may renew
5 it after a verdict has been rendered. Fed. R. Civ. P. 50(b). In response, the court may affirm
6 judgment on the verdict, order a new trial, or direct entry of judgment as a matter of law. *Id.* at
7 (1)–(3). But the legal standard for the latter two options is enormously high. Indeed, a jury
8 verdict receives "considerable deference," *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 775
9 (9th Cir. 1990), and a court must uphold the verdict so long as substantial evidence supports it,
10 *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2006). In turn, judgment as a matter of
11 law is only appropriate "when the evidence, construed in the light most favorable to the
12 nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's
13 verdict." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir. 1997).

14         When considering a Rule 50(b) motion, the court must draw all reasonable inferences in
15 the nonmoving party's favor and cannot make credibility determinations or otherwise weigh the
16 evidence. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000). The court's only
17 role is to assess whether sufficient evidence was presented at trial to support the verdict, not
18 whether the jury could have come to a different conclusion. *Id*. Evidence is substantial if it is
19 adequate to support the jury's conclusions *even if* drawing a contrary conclusion from the
20 evidence is possible. *Wallace*, 479 F.3d at 624. And most importantly, the court "may not
21 substitute its view of the evidence for that of the jury." *Winarto v. Toshiba Am. Elecs.*
22 *Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (internal quotation omitted).

23                    2.    Innovative's Claims

24                         i.    *Negligent Misrepresentation*

25         At trial, Innovative presented two theories of negligent misrepresentation—affirmative
26 misstatement and failure to disclose. (*See* Dkt. Nos. 311 at 2, 332 at 28–29.) Pilgrim's argues

that neither theory is supported by the evidence at trial, and therefore the jury's finding that Pilgrim's is liable for negligent misrepresentation cannot stand. (*See* Dkt. No. 400 at 9–13.)

To succeed on its negligent misrepresentation claim based on an affirmative misstatement, Innovative had to prove that (1) Pilgrim's supplied false information; (2) Pilgrim's knew or should have known the information guided a recipient in their business transactions; (3) Pilgrim's was negligent in communicating the information; (4) Innovative relied on the information; (5) its reliance was reasonable; and, (6) the information proximately caused Innovative's damages. (Dkt. No. 332 at 28) (final jury instructions); *see also Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007) (listing elements). Pilgrim's contests all but the fourth element. (*See* Dkt. No. 400 at 9–11.) However, because the Court granted summary judgment as to the second, third, and fourth element before trial,[1] (*see* Dkt. No. 247 at 7–10), the Court considers only Pilgrim's arguments with respect to the first, fifth, and sixth elements.

As to the first element, Pilgrim's argues Innovative failed to present any evidence that Pilgrim's supplied false information. (Dkt. No. 400 at 9.)[2] To the contrary, there is adequate evidence in the record that Pilgrim's falsely described the Product. For instance, Pilgrim's fact sheet described the Product as "LRG BRST TRIM" (as in, "large breast trim"), which suggested to Innovative's representative, Frank Sorba, that it was boneless and skinless. (Dkt. No. 365 at 127.) Pilgrim's own employees further testified that the Product was supposed to be boneless and skinless breast trim. (Dkt. Nos. 366 at 57–58, 368 at 13–14.) But what Innovative received

---

[1] A point which Pilgrim's itself concedes. (*Id*. at 9.)

[2] In fact, Pilgrim's would have other intermediary brokers take the fall for its false representations about the Product. (*See id*.) But Pilgrim's relitigates a factual issue that more properly arises with respect to the second element, and of which the Court has already disposed. (*See* Dkt. No. 247 at 8.) Indeed, as the Court previously found, "'it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied.'" (Dkt. No. 247 at 8) (quoting *Haberman v. Washington Public Power Supply System*, 744 P.2d 1032, 1068 (Wash. 1987)). The critical inquiry under the first element is not *who* ultimately supplied the false information but rather *whether* the information is false. (*See id*.) (at the summary judgment stage, a genuine issue of material fact existed as to whether the chicken received could reasonably be referred to as "breast trim").

instead was a product that contained excessive bones. (Dkt. No. 365 at 136–42.) Thus, at a minimum, the jury heard evidence that Pilgrim's represented the Product as one made of a material that several others in the industry traditionally considered boneless and skinless, yet Innovative received a product with excessive bones. The jury, therefore, had adequate information to conclude that Pilgrim's falsely described the Product, even if a contrary conclusion (as Pilgrim's would have it) is also possible. *See Wallace*, 479 F.3d at 624.

As to the fifth and sixth elements, Pilgrim's continues to maintain that any material misrepresentations Innovative received came from the intermediary brokers, not Pilgrim's; thus, Innovative's reliance was unreasonable, and Pilgrim's actions were not the proximate cause of its injuries. (Dkt. No. 400 at 11.) Again, this is a red herring and an argument better suited for the second element, which is not at issue here. In any event, as Innovative points out, Pilgrim's own employee testified in a deposition that the product fact sheets are meant to provide the customer with "an understanding of the actual product that the customer is purchasing[.]" (Dkt. No. 368 at 53.) Said differently, Pilgrim's own employee testified that customers can reasonably rely on the product fact sheet—as Innovative did here. Similarly, Mr. Sorba testified that he relied on the defect criteria in the Product's fact sheet, which he received from Houlihan *before* purchasing the Product, and that it is industry custom to use defect criteria when considering whether to purchase a product. (*See* Dkt. No. 365 at 119–20, 125–26.) The jury therefore heard sufficient evidence to conclude that Innovative's reliance was reasonable *and* that it was a proximate cause of its injuries.

Accordingly, Pilgrim's is not entitled to judgment as a matter of law on Innovative's negligent misrepresentation claim.[3]

---

[3] Moreover, because the trial record adequately supports the jury's finding of a negligent misrepresentation based on an affirmative misstatement, the Court declines to consider the merits of Pilgrim's and Innovative's arguments with respect to Innovative's failure to disclose theory. (*See* Dkt. No. 339 at 4) (jurors simply required to find that "Pilgrim's committed a negligent misrepresentation" without specifying under which theory).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

       *ii.     Negligence*

       To succeed on its negligence claim, Innovative had to prove that (1) Pilgrim's owed a duty to exercise ordinary care ("duty"); (2) Pilgrim's breached this duty ("breach"); (3) Innovative suffered an injury ("injury"); and (4) Pilgrim's breach caused the injury ("causation"). *See Keller v. City of Spokane*, 44 P.3d 845, 848 (Wash. 2002). Once again, Pilgrim's primary bone of contention is that the evidence at trial is insufficient to prove the breach and causation elements. (Dkt. No. 400 at 14.) But breach and causation are generally jury issues. *See Vargas v. Inland Washington, LLC*, 452 P.3d 1205, 1213 (Wash. 2019).[4]

       Specifically, Pilgrim's argues that it did not breach any duty to its customers because its product fact sheet, product label, and the Product itself "were all proper and did not include any incorrect or misleading information." (Dkt. No. 400 at 14.) But Pilgrim's fails to cite to the trial record in support. Whereas, Innovative cites to the following: (1) according to Pilgrim's own employees, the Product was supposed to be boneless, (Dkt. No. 367 at 111–12, 114); (2) the product Innovative received was not boneless, (Dkt. No. 365 at 138–42); and (3) Pilgrim's knew of excessive bones in the Product, (Dkt. No. 368 at 24–25), yet it continued to market the Product under representations that it was boneless or mostly boneless, (*see* Dkt. No. 365 at 127). The record further demonstrates that Pilgrim's typically maintains a thorough *daily* quality assurance testing process, (Dkt. No. 368 at 27–31), yet for some reason it did not log any defect criteria inspections during the relevant time frame, (*id*. at 21–23). In other words, the jury heard testimony that Pilgrim's did not follow its own inspection protocol, despite being on notice about the excessive bones in the Product, and it continued to market the Product as boneless. The jury, therefore, heard sufficient evidence to find that Pilgrim's breached a duty of care. *See HBH v.*

---

[4] The existence of a duty itself is, indeed, a question of law. *See id.* at 1212–13. However, Pilgrim's does not dispute that it owed a duty to its buyers "'to exercise reasonable care in selling and marketing products that were correctly labeled, fit for human consumption, and/or obtained from reliable sellers.'" (Dkt. No. 400 at 14) (quoting the Third Amended Complaint).

1  *State*, 387 P.3d 1093, 1101 (Wash. Ct. App. 2016) (employee's failure to conduct regular health

2  and safety checks per employer's policies was sufficient evidence of a breach of duty).

3      As for causation, Pilgrim's argues that Trader Joe's "terminated its business relationship

4  with Innovative for a myriad of reasons." (Dkt. No. 400 at 14.) Thus, Pilgrim's insinuates that

5  even if it breached its duty of care, this breach did not cause Innovative's loss of its relationship

6  with Trader Joe's. But again, Pilgrim's fails to cite any support in the record. (*See id*.) Whereas,

7  Innovative points to testimony that, prior to the excessive bone fragments in the Burgers, Trader

8  Joe's had not considered terminating their business relationship. (Dkt. No. 405 at 20) (citing Dkt.

9  No. 286 at 49). This evidence is adequate to support the jury's causation finding.

10      Pilgrim's is not entitled to judgment as a matter of law on Innovative's negligence claim.

11      *iii.    Washington's Consumer Protection Act*

12      To succeed on its Washington Consumer Protection Act ("CPA") claim, Innovative had

13  to prove that (1) Pilgrim's engaged in an unfair or deceptive act or practice; (2) the act or

14  practice occurred in the conduct of Pilgrim's trade or commerce; (3) the act or practice affects

15  the public interest; (4) Innovative was injured in either its business or its property; and, (5)

16  Pilgrim's act or practice was a proximate cause of Innovative's injury. (Dkt. No. 332 at 13.)

17  Pilgrim's challenges the sufficiency of the evidence to support the first and last elements. (Dkt.

18  No. 400 at 15.)

19      Pilgrim's asserts that it could not have engaged in an unfair or deceptive act or practice

20  because it "represent[ed] 584 Chicken as a product expected to have bones." (*Id*.) But, again,

21  Pilgrim's evidentiary support is scarce. (*See id*.) And to the contrary, the record reflects that

22  Pilgrim's marketed the Product as having minimal to no bones, (*see* Dkt. No. 365 at 119–20,

23  125–26), even though it knew that there was an issue of excessive bones in the Product, (Dkt.

24  No. 368 at 24–25). At minimum, a jury could reasonably conclude that Pilgrim's representations

25  did not accurately capture the excessive amount of bones. This is sufficient for a jury to find an

26  unfair or deceptive act or practice.

1    As for causation, Pilgrim's rehashes the same argument as above, *see supra* Part II.A.2.ii,

2    that is, its acts could not have caused Innovative's damages because "Trader Joe's indicated two

3    separate reasons for which it terminated its business relationship with Innovative." (Dkt. No. 400

4    at 15.) Again, Pilgrim's fails to provide support from the record. In contrast, Innovative points to

5    Trader Joe's testimony that it would not have terminated its contract but for the excessive bone

6    fragments in the Burgers, (*see* Dkt. Nos. 286 at 49, 405 at 21), which resulted from a defective

7    product Innovative purchased in reliance on Pilgrim's representations, (*see* Dkt. No. 365 at 117–

8    20, 125–126).

9    A jury could therefore reasonably infer that Pilgrim's acts caused Innovative's injuries,

10    particularly its loss of its business relationship with Trader Joe's.

11    3.    Houlihan's Breach of Express Warranty Claim

12    Finally, Pilgrim's challenges the jury's verdict for Houlihan's breach of express warranty

13    claim. (Dkt. No. 400 at 16–17.) An express warranty is (1) "[a]ny affirmation of fact or

14    promise", (2) "[a]ny description" or (3) "[a]ny sample or model" by a seller relating to or

15    describing the goods, when such representation forms the "basis of the bargain." *Touchet Valley*

16    *Grain Growers, Inc. v. Opp & Seibold Gen. Const., Inc.*, 831 P.2d 724, 731 (Wash. 1992) (citing

17    RCW 62A.2–313(1)(a)–(c)).

18    According to Pilgrim's, the evidence at trial fails to show that Pilgrim's expressly

19    warranted the Product as a boneless and skinless one. (Dkt. No. 400 at 16.) Instead, as Pilgrim's

20    frames it, its "Large Breast Trim #40 Bulk CO2" representation is consistent with what

21    Innovative ultimately received, and thus, Pilgrim's did not breach any express warranties. (*Id.*)

22    Perhaps a jury could view the evidence from Pilgrim's perspective, but the jury heard testimony

23    that the fact sheet represented the Product as a boneless and skinless one. Indeed, as noted, the

24    designation "large breast trim" indicated to Houlihan (and therefore to Innovative) that the

25    Product would be boneless. (Dkt. Nos. 365 at 127; 366 at 142, 150; 367 at 51, 77.) Innovative

26    relied on this designation in purchasing the Product, (*see* Dkt. No. 365 at 121–126), but the

product it ultimately received contained excessive bones, (*id.* at 136–142). Put simply, the jury heard evidence that Pilgrim's described the Product as having certain criteria that, in the industry, was understood to mean boneless and skinless. It further heard evidence that Innovative used this description as the basis of its purchase decision, and that the product it ultimately received did not meet those criteria.

However, "[r]ecovery for breach of an express warranty is contingent on a plaintiff's knowledge of the representation." *Touchet Valley*, 821 P.2d at 731. Pilgrim's, therefore, asserts that Houlihan did not learn of Pilgrim's representations until *after* it sold the Product to Innovative,[5] such that Houlihan's claim must fail as a matter of law. (Dkt. No. 400 at 17.) But the record is clear as to what came first; indeed, Houlihan presents substantial record evidence that it did, in fact, have this knowledge *before* it sold the Product to Innovative. For one, Houlihan testified that it received a Pilgrim's fact sheet *prior to* brokering sales of the Product to Innovative. (*See* Dkt. Nos. 366 at 150, 367 at 51, 72–73.) And again, this fact sheet represented the Product as "[l]arge breast trim, 40-pound bulk, CO2," (Dkt. No. 366 at 147), which, as the Court described above, indicated to multiple witnesses that the Product would be "boneless" as that term is understood in the industry. Houlihan therefore had knowledge of Pilgrim's representations that the Product would be boneless, per Pilgrim's fact sheets, *prior* to brokering the sale to Innovative.

The record contains substantial evidence to support the jury's verdict in Houlihan's favor on its breach of express warranty claim.

        4.   <u>Summary</u>

Construing the evidence in the light most favorable to Innovative and Houlihan, Pilgrim's fails to demonstrate that the evidence permits only one reasonable conclusion that is contrary to the jury's verdict. *See Omega*, 127 F.3d at 1161. Whereas, Innovative and Houlihan present more than sufficient record evidence to support the jury's verdict. *See Reeves*, 530 U.S. at 150.

---

[5] Again, Pilgrim's does not cite to any evidence to support this factual assertion.

**B.    Motion for a New Trial**

Alternatively, Pilgrim's moves for a new trial under Federal Rule of Civil Procedure 59. (Dkt. No. 400 at 17–20.)

1.    Legal Standard

In general, the court must apply a "stringent standard" to a Rule 59 motion for a new trial, and the moving party bears a heavy burden. *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987). Because "Rule 59 does not specify the grounds on which a motion for new trial may be granted[,]" the Court is "bound by those grounds that have been historically recognized." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Those historically recognized grounds include, but are not limited to, claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Id.*

2.    Jury Instructions & Verdict Form

Pilgrim's accuses the Court of "submit[ing] causes of action and theories of liability not previously pleaded by Innovative," resulting in prejudicial jury instructions and a defective verdict form. (Dkt. No. 400 at 17–18.) This is a gross mischaracterization of the Court's actions. In fact, rather than allow Innovative to submit additional causes of action, the Court encouraged both Innovative and Houlihan to pare down their claims in the middle of trial. (Dkt. No. 367 at 6–7.) The Court concedes that it allowed Innovative to pursue an additional theory of negligent misrepresentation based on a failure to disclose on the eve of trial. (*See* Dkt. No. 311 at 4.) However, the Court must "freely give leave [to amend] when justice so requires," including "when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." Fed. R. Civ. P. 15(a)(2), (b)(1).

Here, the Court concluded that Pilgrim's would not suffer any prejudice from the addition of a failure to disclose theory because that theory already fit the scope of the pleadings and

turned on the same evidence as that of Innovative's affirmative misstatement theory. (*See* Dkt. No. 311 at 4.) In turn, the Court maintained wide discretion to determine whether the evidence supported both an affirmative misstatement and a failure to disclose instruction. *U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1136 (9th Cir. 2023), *cert. denied*, 145 S. Ct. 141 (2024).[6]

As for the verdict form, a district court may submit to the jury a general verdict with special interrogatories "on one or more issues of fact that the jury must decide." Fed. R. Civ. P. 49(b)(1). The decision of whether to submit such a verdict "is committed to the discretion of the trial court." *Sananikone v. United States*, 623 Fed. App'x 324, 326 (9th Cir. 2015) (citation omitted). Contrary to Pilgrim's argument that the verdict form prejudiced it because it "<u>did not</u> separate out each theory for which the jury was deciding," (Dkt. No. 400 at 17) (emphasis in original), the Court explicitly encouraged the parties to simplify the verdict form to avoid any potential for error from the jurors. (Dkt. No. 367 at 6, 61.) Said differently, the Court was mindful of keeping the verdict form as simple as possible to avoid any prejudice to *any* of the parties. It therefore exercised its discretion not to include two separate theories of negligent misrepresentation on the verdict form, when the jurors needed only to find that Innovative proved its negligent misrepresentation claim overall.

Pilgrim's has not demonstrated it was prejudiced by either the jury instructions or the verdict form. Accordingly, Pilgrim's is not entitled to a new trial on this basis.

---

[6] Pilgrim's reliance on *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 1986), is inapt. Notably, the posture giving rise to amendment here differs from that in *Acri*. There, the Ninth Circuit found that trial court did not abuse its discretion in precluding the plaintiff from seeking to amend the pleadings because it found that the amendment "was brought to avoid the possibility of an adverse summary judgment ruling, and that allowing amendment would prejudice [the defendant] because of the necessity for further discovery." *Id*. Neither circumstance is true here.

1

### 3. Damages and Remittitur

2      Finally, Pilgrim's argues Innovative's and Houlihan's awards are excessive and contrary

3  to the clear weight of the evidence, such that the Court must order a new trial or remittitur or, at

4  minimum, offset Innovative's award with Houlihan's $3,000,000 settlement payment. (Dkt. No.

5  400 at 18–20.)

6      In lieu of ordering a new trial, a court may also deny a motion for a new trial conditioned

7  on the plaintiff's acceptance of a remittitur. *See* Fed. R. Civ. P. 59(a); *Fenner v. Dependable*

8  *Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983); RCW 4.76.030. However, the jury's damages

9  award must be upheld "unless the court finds from the record that the damages are outside the

10  range of substantial evidence in the record, shock the conscience of the court, or appear to have

11  been arrived at as the result of passion or prejudice." *Green v. McAllister*, 14 P.3d 795, 801

12  (Wash. Ct. App. 2000) (citations omitted). To that end, when considering a request for remittitur,

13  a trial court must view evidence in the light most favorable to the nonmoving party, *Seymour v.*

14  *Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987), and may not substitute its own

15  judgment for that of the jury, *D & S Redi–Mix v. Sierra Redi–Mix & Contracting Co.*, 692 F.2d

16  1245, 1249 (9th Cir. 1982) (citations omitted).

17                    *i.    Innovative's Award*

18      There is substantial record evidence to support the jury's award to Innovative. Indeed, its

19  damages expert, Mr. Steven Kessler, testified that Innovative suffered a total of $18,393,827 in

20  damages. (Dkt. No. 368 at 126.) In reaching that number, Mr. Kessler calculated Innovative's

21  recall costs and its projected loss[7] from 2022 onward (that is, the first full year after the Trader

22  Joe's contract termination). (*See id.* at 127–36.) With respect to the projected future losses, Mr.

23  Kessler applied a 10% annual growth rate to anticipated Burger sales (absent the bone issue)—

24  which, notably, was a more conservative rate than the actual annual growth rate Mr. Kessler

25

26  [7] Here, the Court's use of the term "projected loss" encompasses Mr. Kessler calculations for
"past loss" and "future loss." (*See id.*)

ORDER
C22-0296-JCC
PAGE - 12

1    observed to date. (*See id*. at 136–138.) And because Innovative sold the Burger for 15 years prior

2    to Trader Joe's termination, Mr. Kessler assumed damages would continue across another 15

3    years, resulting in a projected loss of $16,126,475. (*Id*. at 141.) And should 15 years seem like an

4    overly optimistic estimate of the Burgers' remaining lifecycle, the jury also received evidence of

5    shorter durations, specifically five and ten years, resulting in losses of $9,188,837 and

6    $14,746,808, respectively. (*See* Dkt. Nos. 369 at 73–75, 370 at 60.) Finally, and importantly, the

7    jury heard testimony that because the Trader Joe's contract prohibited Innovative from selling

8    the Burger to *any other customer*, Innovative could not mitigate the future lost profits. (*See* Dkt.

9    Nos. 365 at 114, 368 at 123.) This evidence, when viewed in the light most favorable to

10   Innovative, is more than enough to sustain Innovative's damages award of $10,500,000.[8]

11           *ii.      Houlihan's Award*

12          The Court finds good reason to remit Houlihan's $1,500,000 damages award to zero.

13   Indeed, Houlihan's proof of its damages is tenuous at best. It relies on Innovative's testimony

14   that it bought one to two truckloads of chicken (at 40,000 pounds per truckload) a week from

15   brokers *in general*, not from Houlihan *specifically*, (*see* Dkt. No. 365 at 120), multiplies that

16   amount by Houlihan's testimony that it made three to five cents in profit per pound *in general*,

17   not from Innovative *specifically*, (*see* Dkt. No. 366 at 139–40), to arrive at the conclusion that

18   Houlihan was making $4,000 per week, or $208,000 per year, selling chicken to Innovative. (*See*

19   Dkt. No. 403 at 6–7.) It then applies the *general* theories from Innovative's and Pilgrim's experts

20   regarding future damages, inflation, and reduction to net present value, and argues that this

---

22   [8] Similarly, the Court finds no basis to grant Pilgrim's request to offset the $10,500,000 damages
23   award with the $3,000,000 payment Innovative received from Houlihan in settlement (Dkt. No.
     400 at 19–20). Federal courts sitting in diversity apply state law regarding damages. *Clausen v.
24   M/V NEW CARISSA*, 339 F.3d 1049, 1065–66 (9th Cir. 2003) (citing cases). Washington state
     law disallows credits for amounts received in settlement in cases where liability is proportionate,
25   as is true here. *See Waite v. Morisette*, 843 P.2d 1121, 1123–24 (Wash. Ct. App. 1993); (Dkt.
     No. 311 at 22) (declining to apply joint and several liability in this case). This sentiment is
26   especially true here, where the jury found Pilgrim's 100% liable for Innovative's injuries. (Dkt.
     No. 339 at 4.)

*general* evidence must have convinced the jury to award "about 7.2 years' worth of past and future lost profits at $208,000 per year," *i.e.*, $1,500,000. (*Id.* at 7.) This theory is far too speculative.

Even if Innovative *generally* bought one to two truckloads per week from brokers, and even if Houlihan *generally* made three to five cents per pound, these two facts combined do not lead to the conclusion that Innovative bought *exclusively* from Houlihan, nor that Houlihan *exclusively* made its profits off Innovative. To the contrary, Innovative testified that it had relationships with multiple local brokers. (*See* Dkt. No. 365 at 120.) Even more tellingly, Houlihan itself testified that "Innovative would usually purchase two to four truckloads of product from me *per month*," (Dkt. No. 366 at 141) (emphasis added), not per week as Houlihan now asserts. At four truckloads, or 160,000 pounds, per month, and at a five-cents-per-pound profit margin, Houlihan would make, at best, $8,000 per month, or $96,000 per year—certainly not $208,000 per year. And of course, there is no evidence in the record to suggest that 7.2 years was a reasonable term over which to calculate Houlihan's future losses.

At bottom, the jury's damages award for Houlihan falls well outside the range of any evidence in the record, *see Green*, 14 P.3d at 801, because there is simply no evidence in the record to support any damages for Houlihan.

## III.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

- Pilgrim's renewed motion for judgment as a matter of law, its motion for a new trial, and its request to remit Innovative's damages award are DENIED.

- Pilgrim's request for remittitur of Houlihan's damages award is GRANTED. The Court remits the award to zero, conditioned on Houlihan's acceptance. Houlihan shall notify the Court within 14 days of this Order whether it accepts or rejects the remittitur. If Houlihan rejects the remittitur, the Court will grant a new trial solely on the issue of Houlihan's damages.

1    //

2    //

3    //

4            DATED this 24th day of July 2025.

John C. Coughenour
UNITED STATES DISTRICT JUDGE